on behalf of Joaquin Villasenor-Chavez, and I would like to reserve two minutes. The fact is, I was the trial counsel for Joaquin, and he was a charro, a cowboy, came from Michoacan, ranch hand, came to earn a living in this country. And the problem is, he'd been here before, he'd been caught before, he'd been voluntary returned several times. Pardon me? Every two months. In the last few months before, yes, every couple months. And he had served some time, six days' time served, and had an illegal reentry on his record. This drew the attention of the Border Patrol immediately to him, and from there on out, he was a target. And this, I believe, the issue here, and it is, the standard of review is de novo, under Bagley and Hamilton, with a mis-ID question. But it's not so much mis-ID, the question Well, yeah, that, I kind of want to explore that with you, because it happens somewhat at the last minute. But the suggestions that I'm getting from you are, it seems that it, the photo ID line-up, you're sort of turning things on their head, in the sense that the six-person line-up, my understanding is, they put people that looked like Mr. Villaseñor Chavez. But you seem to think that the line-up should have been just everyone that was there. But then those wouldn't be people, you know, then it would be sort of like, if you put me in the, you put women and men in the line-up and all of those sort of things, then that clearly would be, it wouldn't, it seems it wouldn't meet the standards of the line-up. And there's no doubt that he was there. That's undisputed. He was there. The issue is really, was he the guide, or was he just one of the folks? So your suggestive ID question is really a little bit, they didn't mis-identify someone that was there. Your point is that you feel that some, so it isn't your classic identification thing. It is not. And the photo line-up that you're proposing should have been done. I'm sure that we would have said that wasn't a good photo line-up, that you just do a photo line-up of men and women and any people that don't look alike. So you're trying to kind of fit something square into something round. Well, I'm not sure that, first off, that the line-up included others who look like him, other than the fact that they were male Hispanics. But in the group, of course, my argument, and I think even the government's expert at trial agreed that it would have been fairer for them to have picked who was the guide amongst their group with a line-up that entailed other, even if it's just the males, which the majority were male, suspects, if you will, or members of the group. The issue really wasn't identification, because everybody had two days to study everybody else. The issue really was, what were the functions undertaken by this particular person to make him the guide? So, as I understand the case, it's not an identification case. It's a sufficiency of evidence case, sufficient evidence to show that this particular person functioned as a guide. Yes, but as part of that, of course, what the government does is use the typical line-up procedures, which include this six-person photo pack. Maybe they didn't need a line-up at all. Perhaps not, but then you're left with a one-on-one. That's right. That's true. Well, it is to the sense that they went through the process, and if they do go through the process, they need to keep it fair. Due process mandates, and, of course, the law requires Foster v. California, is I think one of the core keystones here. This district, I believe, suggested that if the procedure is so defective, it's to make the identification constitutionally invalid. You're really confusing the issue, are you not? As both my colleagues have indicated, this isn't really an ID case. As I understand the case law, in order for you to be successful on this one, you've got to show on the ID part, you've got to show there's substantial likelihood of irreparable misidentification. You don't even come close on this, do you? You've got all kinds of people who were with this man for several, at least two days. It really gets down to what our colleague from New York indicates, isn't it, where we're really talking about whether you have sufficient evidence to finger him as the coyote. Isn't that really the issue we're talking about here? That's true. But if you look at the steps taken, they must still be fair. You can't have a person's photo. Unfortunately, as humans, nothing's perfect. And you can argue all day long that they should have had a different lineup. But the reality is it's kind of like harmless error. The reality is you've got people, I think five or six, if I recall correctly, who outside the lineup knew perfectly well who this guy was. They were with him. The lineup, as has been suggested, probably wasn't even necessary. But they had it. So if it was flawed, it was flawed. But certainly there was no harm, certainly no due process error that blows the whole thing up, is there? Well, the problem is, Judge, that from the beginning, before the video depositions took place, almost two months later, when they were housed separately and apart, completely the material witnesses kept separate from Mr. Villasenor, the the they targeted Mr. Villasenor by putting the photo up on a computer, which is equivalent of a one-on-one confrontation. It's equivalent of a show-up, if you will. They asked questions, and four, at least four of the material witnesses did not identify him as the guide. Kagan. So, okay, but here's the thing. Assuming the Border Patrol's tactics were suggestive, not really an improper identification, but suggestive, why was the district court's denial of the motion to suppress not-harmless error be given that there was cross-examination and direct argument to the jury regarding the suggestive nature of these tactics? So the jury got they saw that, you brought it all up, and they didn't buy it. So that, you know, as you know, I'm not trying to lecture you on this point, but you know we're not a trial court. So and all of that happened in the trial court. The jury had you had you brought it was all brought up there, and they just didn't buy it. They said this is the guide. Well, I believe the argument is, Your Honor, that the first screening should be by the district court. And it's discretionary, of course, to allow the motion to be heard, first off. But when you don't even get past step one, what I'm arguing is there becomes this perfect storm of circumstances that lead a jury to convict him. You have the ruling. But did you bring up all this? Were you the trial? Yes, I was. Okay. So didn't you bring up before the jury everything that was suggestive that was done, and you argued that all to the jury? Yes, I did. And you lost. And I did ask for a motion for directed verdict, which, of course, is now the second part. So then that's like a sufficiency of the evidence again. So what my colleagues are saying is then let's look at the evidence. What was the evidence that he was the guide? Other, you know, all these people identified him, but then there was other witness, I believe, that testified as to how guides work. And there was a cell phone, which was missing the SIM card, which I don't know if we know exactly why it was missing the SIM card. And the test that was linked into that, and there was testimony that your guy after the person passed out or whatever was on the cell phone and then did certain things to try to resuscitate the guy. And so the jury just heard it all. Either it was, you know, you argue it wasn't beyond a reasonable doubt, but the question is sufficiency of the evidence is a very low burden. And, yes, Your Honor. Were you unable to make any argument because you were denied a suppression? Or were you able to make all the arguments you wanted to make? I was able to make all the arguments I wanted to make at trial, yes. But what is lost for having lost? Why are you not having the opportunity for suppression here? Well, there's a combination of factors, again, that take place. We have my hands. Well, I'm rejected at the motion. That's true. Exactly. And the sentencing then is enhanced, I believe, improperly. Because he testified. That's his choice. Okay. But he makes the choice he has to testify truthfully. And what the jury does here is how there was a – Suppression would have won the suppression. The fact that the judge did not grant you a motion to strike meant that you were denied the suppression also? Well, we don't know that because the judge never heard the motion. But it didn't grant you a motion to strike. It didn't, right. It didn't grant you a directed verdict. That's correct. Obviously, you felt that the only evidence in the trial that identified the defendant as the guy was sufficiently credible. Well, that's – yeah, that's what the judge found. And my opinion is that there are many reasons why, of course, a jury can reject the facts of a case. In this case, they have a confluence of by the time these witnesses who are kept separate get to the video depositions two months later, they are all in agreement, no doubt. The point you're making is that the evidence was unreliable. But at the same point, whether you had or did not have a suppression opportunity. Yes, that's true. We did have the opportunity at trial. My argument is that the judge should have heard it and that the judge is a more reliable arbiter, I believe, of the law than the jury. And while it is true we get a second bite of that apple, I believe that the judge failed in her duty and abused her discretion by not – by not dismissing an affront, and certainly by not granting the Rule 29 motion for directed verdict acquittal. That was just part of the accumulation that the jury then heard and took into account. And it's unknown, in fact, you know, what they've gone – went through their minds on the – I did? Okay, Judge. The other points are, of course, we're talking about the argument regarding financial gain, that the Court must establish that there was financial gain in the – by the profiteering at the hands of the smuggler, the guide, Mr. Villasenor, in this case. If he's proved as a guide, given the evidence of payment to others, the evidence of customary payment to the guide after everything was done, is there an inference that the jury permissibly withdrew that proof? Judge, yes, but in this case, there's case law that I cite that talk about – that contrasts clearly with what happened in our case, and there's stark contrast in which advantage or private financial gain is found, there's nothing here. There's nothing other than the fact that he's alleged to be the guide. No money exchanged hands. What did come into evidence was that he never exchanged any money with anyone. Well, that can be true, but that's not that there's no money – there's no evidence of money, because there is testimony from all the other people that were there how they paid their money. So that – the question is sufficiency once again, I believe. Yes, and in fact, the other cases do talk about much more is what I'm saying, that they require a showing of recruiting and being brought in and being part of a greater scheme perhaps, none of which was brought out either, none of which was brought out to show. My client was just simply seen at the front where he was following the actual guide. At least one witness described as El Gordo and described as how he, you know, he was not present, that he did get away. Originally, the group talked about 13 people, and when they end up with nine, then my client – Do you want to reserve any time for rebuttal? I would. Okay. Thanks. Good morning, Your Honors. Erica McCallum. Good morning. Say your name again. I'm sorry. Erica McCallum. I'm appearing for the District of Arizona-Tucson on behalf of the government. Okay. If you can keep your voice up, that would be great. Okay. It appears it's very clear that this Court is abundantly familiar with the record in this case, so I don't have a whole lot to add. I would point out that the defendant is arguing that it's necessary for the district court to prescreen any sort of an ID issue before it's submitted to the jury, and that's simply not correct under the law. Under the Perry case and the Engle case, which I mentioned in my 28J letter, prescreening is only really – it's only necessary when the defense shows, establishes that there's sufficient taint that there's going to be a substantial injurious effect on the verdict, and that simply didn't happen here. So prescreening was not even necessary. In addition, this Court asked defense counsel, did you get an opportunity to make every argument that you wanted to make to the jury? Did you cross-examine the witnesses sufficiently? He said yes, and I would just add some support to that in that he argued in his opening and closing that the identifications were the, quote-unquote, most suggestive he had seen. But he argued – I know one of the things is there were some witnesses that were initially not able to identify Mr. Villaseñor as a guide, but were able to after being housed together for six weeks. Did he bring that up to the jury? He did. He did, but that's not entirely factually correct. And if I could just briefly go through the numbers here, I think it's helpful to get a sense of how this worked out. There were nine material witnesses who were detained. Initially, in the Border Patrol interviews, five of those identified the defendant in what we call a six-pack of photo array. Of those five, three of those had seen this computer photo that the defendant claims was unduly suggestive. A fourth person also saw that photo and did not identify the defendant in a six-pack. The four people who did not identify the defendant initially in that six-pack during the material witness depositions, which were, of course, their trial testimony, all nine identified the defendant. And the four who had not, when they spoke with us, this was because we were afraid and this was because the defendant had coached us that we had been sitting together in a vehicle awaiting transport to the Border Patrol Station and he told us, tell Border Patrol the guide got away, which was, of course, his story as well. Well, let me ask you this. Since if this were, if we're to analyze it, if we were to analyze it under a sufficiency of the evidence standard, just give me a summary of all the evidence that, since he has been convicted, that we would be entitled to consider and inferences thereof for, you know, the strength of your analysis of the strength of your case. Well, the verdict was supported by, number one, unanimous identifications of the defendant as the guide by all nine of the material witnesses. And that was actually stipulated, too, by the defense at trial. Their trial testimony was entirely consistent. They all described the defendant as their guide. They all described having spent two days following him through the desert. They all described having, had to follow his instructions as to when to stop, hide when Border Patrol was coming, when to walk, when to rest. Several of them testified that when they became ill, the defendant had the group stop and wait until they felt better. They all consistently described how when the decedent became ill, they all stopped as a group, including the defendant, and tried to assist this person, gave him the last of their water, opened his clothing, tried to save his life, and then he essentially died in their arms. Now, all of this, of course, supports the inference that these folks knew who the guide was because they had been through this horrific experience with him. And, in fact, a number of them had become ill. Their consistent, their testimony was consistent with the expert testimony, which is this is how these organizations operate, this is what guides do, and this is how, and this is what, the expert didn't testify to this, but the inference is, and that's what happened in his case. It was consistent. In addition, there was the defendant's crossing history, which this panel has already referenced. During that particular year, this was his fifth attempt to cross into the United States through southern Arizona. He'd been caught five times, all in the same general area. And when he testified, he admitted, I knew, I was familiar with the geography, I knew what the mountains looked like, I knew our destination was Highway 80, so he knew how it worked. He also admitted guides get paid. I know they get paid. There was also, for the jury to consider his non-credible testimony, and this defendant testified, I had a phone. I was told not to use it. I didn't use it. Oh, yes, I did use it. I texted my wife. Then I turned it off and I didn't use it again. No, actually, my wife texted me back. He testified, I'm looking for my notes here as far as his inconsistencies, that his crossing was a sudden inspiration, a sudden idea to cross into the United States, whereas he had this pattern of having already crossed four prior times during the year 2011. He also testified that he didn't call for help when the man was dying, although all the material witnesses had said that they'd seen him make a phone call. And his reason was, it never occurred to me to use my phone that way. So I think, oh, and he also testified, after we were apprehended, we did not wait together. There was no time when the group was together when I could have coached them, and I never threatened them, although several of the material witnesses described a situation where the defendant, while awaiting their first court hearing at the courthouse, had taken a couple aside and said, if you identify me as the guide, some of you are going to stay in jail with me. So I think that abundance of information that he had. There was no SIM card in the phone. How was that argued? Well, what was done instead of searching the SIM card was that you can still open a phone and look at the history of phone calls or of numbers that are inside the phone. So there was some reference in the testimony to the phone showed that there had been use of the phone, but there was no specific evidence offered by the government to support that the defendant had used the phone to contact guides or anything of that sort. Did the government argue that he dumped the SIM card as part of trying to destroy evidence? No, that wasn't the argument. I don't know whether it came out at trial, but what had actually happened, and this was discussed at pretrial hearings, was that apparently Border Patrol had somehow between taking the phone in as evidence and looking at it later, the SIM card had gone missing. So the inference is it was Border Patrol. Yes, and that argument was not made. All right. Apparently, the judge applied a perjury enhancement. Is that correct? Yes. But I — it didn't increase the statutory minimum, and I think there was an argument that it had to be submitted to the jury, but that it didn't increase it. But — What was there about that perjury, that obstruction of justice enhancement that justified an extra two points? The jury disagreed with the defendant, but that's not enough. Sometimes non-credibility, sometimes non-credibility. What was it that justified it? Because you've got to be able to — you know, people, they have a — they have Fifth Amendment rights, and also, too, if they deny something, then you punish them because they say, well, they didn't plead guilty. So what — according to Judge Hammerstein, what's the basis here? Well, of course, according to Armstrong, there's no constitutional right to lie on the stand. Under Armstrong, Garo, and Manning, when the defendant — If I could quote from what the district court's finding was, what she said, and she had listened to all the testimony at trial, was the court finds after its independent evaluation of the evidence that the defendant lied to the jury, committed perjury by making the statement to the jury that he was not the guide, all the evidence contradicts that, including the testimony of numerous witnesses that he was the guide. So the district court's finding was he got on the stand and he lied. He told a story of having followed another who was the guide, and along the way, he just couldn't keep following him until he was bucked. The jury did not believe that story. That's correct. But does that mean it's necessarily true? To clarify, I'm a little — I'm a little — I just want to be — Coming up as a district judge, you have some degree of freedom. What was the trouble on this? Because the jury was right. It's not always right. Well, the jury found that the government proved the case beyond a reasonable doubt, and so that, in a sense — But they have a right to deny it, and they have a right to hold you to the burden of proof. So when you can say it's perjury, just the fact that someone denies that they're guilty, that can't be enough right there, right? So what is enough for perjury? Well, I think — I want to be cautious about using the term perjury because the guideline enhancement or adjustment that was applied is for obstruction of justice. And defendant is arguing that the jury had to — there had to be a perjury charge. The jury had to make a finding of perjury. And that's simply incorrect. That's not — that's not — yeah. But — And the — But, okay. But if I could just have a moment to clarify, the guideline that was applied actually says if there were a perjury finding by the jury, a different guideline, which is 2J1.3, would apply and would have a different sentencing framework. So we're talking about obstruction here. And I think it's sufficient for the district court to make, by a preponderance of the evidence of finding, that the defendant lied, even though it's not perjury proven beyond the shadow of a doubt. If you look at his story to the jury, what the presentation was, it all focused on the idea he was not the guy, right? The jury didn't believe that. And it required the government to put on a lot more evidence and do a lot of other things that would not have been the case otherwise. Is that sufficient to constitute an obstruction of justice for purposes of a two-point enhancement? I believe it is, and I believe that's encompassed by the language of the guideline that was applied, which is 3C1.1, because it's an obstruction of the process. So 3C1.1 So in other words, if the defendant lies, in other words, in the sense that the government's case, does that in and of itself constitute obstruction of justice? Couldn't you find obstruction of justice in every criminal case where a defendant tells something that's different than the government's indictment-led charges? Well, the guideline actually contains two sets of lists, one of which is these, while they may be untruthfulness by the defendant, don't rise to the level of obstruction. Well, is the obstruction also that he told these other people in the car what he told them? Is that part of the obstruction? I think that, again, this Court can --. Because obviously, if just because you don't, if just because you're not a cooperative defendant, you say, by golly, I want my right to a jury trial. The judge didn't cite that. It cited it in a different story. I didn't cite it in a testimonial. It's not the case. The Court of Court of Justice, I mean, this Court can support the district court's decision by anything that is supported in the record. So there are various arguments that could be made that would support an obstruction enhancement. In fact, if you look at the sentencing hearing, the parties were arguing about much finer details which would have been possibly untruths by the defendant, like, you know, he didn't tell the truth about where he was going in the United States when he entered. The district court cut all that off and said, no, I've listened to the trial testimony. He lied on the stand. That constitutes obstruction. She did use the term perjury, but I think that the guideline is broader than that, and so this Court can apply it. So if this panel has no further questions. Kagan. I don't appear to have other questions. I'd ask you to affirm. Thank you. Thank you. All right. You basically have two minutes, so. Thank you. May it please the Court. You did hit on a key point. One of my arguments was, of course, that perjury should not have been found in the obstruction of justice, two-point enhancement should not have been added. And I look to my brief at page 25 for the citing Dunnigan case. Was it clear error? I'm sorry? Was it clear error by the district judge? Yes, I believe so. The court in Dunnigan clearly lies out the prongs that are required, and it's the giving of false testimony, number two, concerning a material matter, three, with willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory. I don't believe the Court met that three prongs. And for that reason, I believe that the two-prong, two-level enhancement should not have been applied. Well, I mean, it's the same thing. It's not to do a negative. It's saying I was not the guy. That's true. Well, I believe the judge assumed that the jury did not believe him. But there are many reasons, of course, why a jury can find a person guilty wholly and apart. He's there. He's sitting there all the time listening to his testimony. That's true. He was not credible. Nevertheless, the court has said that they have to lay out, the district court must lay out its findings. I don't believe she did so, stating exactly why, to meet the prongs that are required. In summary, I believe that this was a perfect storm of circumstances that created, I believe, insufficiency of the evidence. I believe even under that lesser standard, I believe the facts do not stand up. And you have four material witnesses at the beginning saying he is not the guide. The Border Patrol does everything possible to persuade them until the end. Even after they see the photo of my gentleman on the computer screen, they still don't identify him. After the photo lineup, some still don't until after two months in custody, separate and apart from my client. When they do come together and testify against him and it's clear that they're going to be going home, which is what happens, and no charges will be filed. That, I believe, is the deprivation of due process. The idea is simply what the ---- You're moving into over your half a minute over, so if you just wind up, that would be excellent. Absolutely. Well, the government tells you that the procedure was not unduly suggestive, but I believe if you look at my brief and even the government's brief, what they cite, the material witnesses contradict that completely in their testimony, saying there was a guide who got away. His name was Gordo or Jose, that there was, in fact, this person helped, my client helped the person who was dying, and that the use of his phone was a critical piece of evidence that the government did lost. Thank you. All right. Thank you both for your argument. You both showed a good command of the record, and we always appreciate that. Thank you. This matter will stand submitted.
judges: Hellerstein, Callahan, Smith